IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KEVIN JOYNER,
     Petitioner,

vs.                             Case No.:  3:17cv387/LAC/EMT

MARK S. INCH,[1]
     Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 24).  Respondent filed an answer and relevant portions of the state court record (ECF Nos. 37, 39).  Petitioner filed a reply and then a supplement (ECF Nos. 41, 45).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

---

[1] Mark S. Inch succeeded Julie L. Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent.  *See* Fed. R. Civ. P. 25(d).

further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF Nos. 37, 39).[2]    Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2012-CF-0050, with one count of conspiracy to engage in a pattern of racketeering activity (Count 1), one count of grand theft ($10,000 or more and less than $20,000) (Count 2), and one count of failure to appear (Count 3) (Ex. A at 16–17). On August 22, 2014, a jury found Petitioner guilty as charged on all three counts (*id.* at 429–30, Ex. B). On December 5, 2014, the court sentenced Petitioner to twelve (12) years in prison, with pre-sentence jail credit of 513 days, followed by five (5) years of probation on Count 1 (Ex. A at 486–95, 501–04).    The court sentenced Petitioner to five (5) years in prison, with pre-sentence jail credit of 513 days, on Count 2, to run concurrently with the sentence on Count 1 (*id.*).    As to Count 3, the court sentenced Petitioner to five (5) years in prison, with no jail credit, to run concurrently with the sentence on Count 1 but consecutively to the sentence on Count 2 (*id.*).

---

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF Nos. 37, 39).  If a cited page has more than one page number, the

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D14-5699 (Ex. A at 505). Petitioner's counsel filed an initial brief (Ex. C). Petitioner filed a pro se supplemental initial brief (Ex. D), but the First DCA struck the pro se brief as unauthorized (Ex. E). The First DCA affirmed the judgment per curiam without written opinion on January 5, 2016, with the mandate issuing February 2, 2016 (Exs. H, I). <u>Joyner v. State</u>, 182 So. 3d 642 (Fla. 1st DCA 2016) (Table).

On May 22, 2016, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. J at 1–6). Petitioner subsequently filed an amended motion and a second amended motion (*id.* at 7– 29). In an order rendered July 22, 2016, the state circuit court struck the motions as facially insufficient, without prejudice to Petitioner's filing a third amended motion within sixty (60) days (*id.* at 38–39). Petitioner filed a timely third amended motion (*id.* at 45–67). The state circuit court summarily denied the motion on October 28, 2016 (*id.* at 74–77). Petitioner appealed the decision to the First DCA, Case No. 1D16-5216 (Exs. K, L). The First DCA affirmed the decision per curiam without written opinion on January 30, 2017, with the mandate issuing February 27, 2017 (Exs. M, N). <u>Joyner v. State</u>, 222 So. 3d 1207 (Fla. 1st DCA 2017) (Table).

court cites to the "Bates stamp" page number.

Petitioner filed the instant federal habeas action on May 2, 2017 (ECF No. 1).  He filed an amended petition, which is the operative pleading, on July 9, 2018 (ECF No. 24).

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > **(1)**    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > **(2)**    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached
> by this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue.  Thaler v. Haynes, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); Woods v. Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1) does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. See Woods, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. See Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. Williams, 529 U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).   In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   The "unreasonable determination of the facts" standard is implicated only to the extent

the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." <u>Brumfield v. Cain</u>, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court

adjudications. *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* <u>Panetti</u>, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." <u>Richter</u>, 562 U.S. at 102.

## III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner exhaust available state court remedies, *see* 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S.

270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner makes a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the Sixth Circuit Court of Appeals granted the habeas petitioner on the ground that a jury instruction

violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7.  On review by the Supreme Court, the Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court

in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.

In Baldwin v. Reese, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The Baldwin court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with

---

[3] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. See Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. See Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by

---

[4] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was

federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. *Id.* A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state

---

important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. *Id.*

court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  *Id.*  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause for the default and prejudice resulting therefrom, or a that the federal court's failure to reach the merits of the claim would result in a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327,

---

[5] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995);

115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

Id. Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. See McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; see also House v. Bell, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS

A.    Ground One:    "State failed to prove all of the elements of an enterprise at trial."

---

Alderman v. Zant, 22 F.3d 1541, 1549 (11th Cir. 1994).

Petitioner contends the evidence presented at trial was insufficient to prove the "enterprise" element of the RICO conspiracy charge (ECF No. 24 at 3–10).[6] Petitioner asserts he presented this claim to the state courts on direct appeal and in his Rule 3.850 motion (*id.* at 11).

Respondent contends to the extent Petitioner is arguing that the evidence at trial failed to prove the existence of an enterprise separate and apart from the pattern of racketeering activity, the issue was presented as Issue Three on direct appeal (ECF No. 37 at 19). Respondent contends Petitioner failed to establish the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established Supreme Court law (*id.* at 19–24).

### 1.    Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict; that is, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence in federal habeas corpus, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a

---

[6] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than the page numbers of

reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original) (citation omitted). The evidence need not rule out every theory except that which signifies guilt beyond a reasonable doubt; "[t]he simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). Moreover, because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.*

### 2. Federal Review of State Court Decision

As Issue Three on direct appeal, Petitioner's appellate counsel argued that the trial court erred in denying Petitioner's motion for judgment of acquittal on the RICO conspiracy charge (Ex. C at 34–41). The First DCA rejected this claim in an unexplained decision (Ex. H). The First DCA's decision was an adjudication of the merits of Petitioner's federal claim. *See* <u>Richter</u>, 562 U.S. at 99 (holding that when a state court issues an order that summarily rejects without discussion all the claims raised by a defendant, including a federal claim that the defendant

the original documents.

subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits in the absence of any indication or state-law procedural principles to the contrary).[7]

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." Wright v. Moore, 278 F.3d 1245, 1254 (11th Cir. 2002). Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision. See Richter, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See id. at 102; see also Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection

---

[7] Petitioner subsequently presented this claim in Ground Four of his third amended Rule 3.850 motion (Ex. J at 54–66). The state circuit court rejected the claim on purely state procedural grounds (i.e., that the issue could have and should have been presented on direct appeal) (id. at 76). The First DCA affirmed the circuit court's decision without written opinion (Ex. M). Considering the state courts' clear application of a procedural bar to this claim in the Rule 3.850 proceeding, the adjudication was not a "merits" adjudication for federal habeas purposes. See Richter, 562 U.S. at 99–100. Therefore, the last state court to adjudicate the merits of the sufficiency-of-the-evidence claim was the First DCA in the direct appeal.

of the petitioner's claims was not an unreasonable application of a Supreme Court holding).

The Supreme Court has described the analysis of <u>Jackson</u> claims in federal habeas proceedings as involving "two layers of judicial deference."  *See* <u>Coleman v. Johnson</u>, 566 U.S. 650, 651, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012).  First, a court may set aside a jury verdict "only if no rational trier of fact could have agreed with the jury."  *Id.* (internal quotation marks and citation omitted).  Second, a state court decision may only be overturned if it was "objectively unreasonable." *Id.* (internal quotation marks and citation omitted).

In Petitioner's case, the trial court instructed the jury on the crime of conspiracy to engage in a pattern of racketeering activity as follows:

> The conspiracy is a combination or agreement of two or more persons to join together in an attempt to accomplish an offense which would be a violation of the law.  It's a kind of a partnership in criminal purposes in which each member becomes the agent of every other member.

> The evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement or that they directly discussed between themselves the details of the scheme and its purpose or the precise ways in which the purpose was to be accomplished.  Neither must it be proved that all of the persons charged to have been members of the conspiracy were, in fact, members nor that the alleged conspirators actually succeeded in accomplishing their [ ] [un]lawful objectives nor that any alleged member of the conspiracy did any act in furtherance of the conspiracy.

What the evidence in the case must show beyond a reasonable doubt before you may find the defendant guilty of conspiring to violate the RICO Act is:

. . . .

First, that two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, namely to engage in a pattern of racketeering activity as charged in the information; and,

Second, that the defendant, Mr. Joyner, knowingly and willfully became a member of such conspiracy; and,

Third, that at that time the defendant joined that conspiracy, he did so with the specific intent either to personally engage in at least two incidents of racketeering, as alleged in the information, or he specifically intended to otherwise participate in the affairs of the enterprise with the knowledge and intent that other members of the conspiracy would engage in at least two incidents of racketeering, as alleged in the information, as part of a pattern of racketeering activity.

A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged conspirators. So, if a defendant has an understanding of the unlawful nature of a plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict him for conspiracy, even though he did not participate before and even though he played only a minor part.

Of course, mere presence at the scene of a transaction or event or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of a conspiracy does not thereby become a conspirator.

I used the phrase "pattern of racketeering activity" a few moments ago. Here's what the definition is: A pattern of racketeering activity means engaging in at least two incidents of

racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

An "enterprise" which I referred to earlier, is an ongoing organization, formal or informal, that both functions as a continuing unit and has a common purpose of engaging in a course of conduct.

(Ex. B at 1049–52; *see also* Ex. A at 420–21).

The theory underlying the State's RICO conspiracy charge was that Petitioner and four other persons (Naomi Iftakar, Tisha Ruman, Harold Carter, and Javarius Slater), all of whom testified for the State at Petitioner's trial, designed and acted upon a scheme to print counterfeit checks and then cash them at local businesses. Ms. Iftakar testified that in November of 2011, she became involved with Petitioner, Ms. Ruman, Mr. Carter, and Mr. Slater in passing back checks (Ex. B at 435–37). Ms. Iftakar testified that Petitioner was the leader of the group, and she described his role as follows:

> From the very first time that I met him, I mean, he was very dominant in everything that took place. He gave the orders. He basically called the shots. And he was the one that—any money that was cashed from a check was put in his hand.

(Ex. B at 437). Ms. Iftakar testified she personally observed Petitioner and Ms. Ruman manufacture counterfeit business checks on at least five or six occasions (*id.* at 437–38). Ms. Iftakar testified Petitioner was the person who selected the small businesses in which the counterfeit checks would be cashed (*id.* at 438–39).

Iftakar testified Petitioner and Ms. Ruman were "boyfriend and girlfriend," and they stayed at several motels in the Pensacola area, including the Days Inn on Palafox Street and the Key West Inn on Highway 29 (*id.* at 438–39). Ms. Iftakar testified that none of them were employed (*id* .at 439–40).

Ms. Iftakar testified she initially learned about the counterfeit check cashing scheme from Harold Carter in his motel room at the Palm Court (Ex. B at 441–43). She testified Mr. Carter was "flashing around" a large sum of money and described how he and others went to different stores to try to cash counterfeit checks (*id.*). Ms. Iftakar testified she met Ms. Ruman that day (*id.*). Iftakar testified she met with Ms. Ruman and Petitioner a few days later, and they "discussed in detail . . . the whole process" (*id.* at 443). Ms. Iftakar testified Petitioner owned a black Yukon SUV (*id.* at 443–44). Iftakar testified she rode with Petitioner and Ms. Ruman in the vehicle, and they showed her "how it was done" (*id.* at 443).

Ms. Iftakar testified she went with Petitioner and Ms. Ruman to the driver's license department, and Petitioner and Ruman paid for Iftakar to obtain an identification card (Ex. B at 445). Ms. Iftakar testified Petitioner and Ms. Ruman provided her with checks, and she cashed them at several businesses (*id.* at 445– 49). Ms. Iftakar testified that she, Petitioner, Ms. Ruman, and Mr. Carter initially rode in Petitioner's vehicle together when they cashed the counterfeit checks; and shortly thereafter, Mr. Slater joined them in the scheme (*id.* at 450–52). Ms.

Iftakar testified that after she cashed a counterfeit check, she gave the cash to Petitioner, and he returned half of the cash to her (*id.* at 445–49). Ms. Iftakar identified several checks as the counterfeit checks she received from Petitioner and then cashed, and the checks were admitted into evidence (*id.*).

Ms. Iftakar testified that their counterfeit check cashing scheme involved the use of cellphones (Ex. B at 452). She testified each cellphone was labeled with the name and telephone number of the business which supposedly issued the respective check (*id.*). Ms. Iftakar testified Petitioner and Ms. Ruman brought the cellphones in Petitioner's vehicle (*id.*). Ms. Iftakar testified that if a victim business called the phone number of the business which appeared on the counterfeit check to verify the authenticity of the check, Petitioner or Ms. Ruman would answer the cellphone and pose as a human resources person from the business (*id.* at 452, 461). Ms. Iftakar testified that Petitioner was never a payee/casher of a counterfeit check; rather, his role was to "call the shots," produce the counterfeit checks, drive the payees/cashers to victim businesses, communicate via cellphone during the check cashing transaction if necessary, take the cash from each transaction, and then pay each payee/casher half of the cash (*id.* at 452–55).

Ms. Iftakar testified that when she went to Petitioner and Ms. Ruman's motel room at the Days Inn, she observed two desktop computers, a laptop, a printer, and "an enormous amount of check printer paper" (Ex. B at 457). Ms.

Iftakar testified that Petitioner showed her how to create routing numbers on checks (*id.* at 472).

Ms. Iftakar testified that her participation in the check cashing scheme began in November of 2011, and ended on December 29, 2011 (Ex. B at 457). Ms. Iftakar testified that on December 29, 2011, Petitioner drover her and Ms. Ruman to a Barnes grocery store on Pace Boulevard (*id.* at 458). Iftakar testified she was attempting to cash a counterfeit check, but "it started taking a little bit longer than normal" (*id.*). Ms. Iftakar testified she turned around, and Ms. Ruman had left the store (*id.*). Iftakar testified that a female deputy entered the store and arrested her (*id.* at 458–59). Iftakar testified she attempted to flee, but was apprehended in the parking lot (*id.* at 459). She testified that when she realized Petitioner and Ms. Ruman had left the parking lot, she became upset and told a deputy that if they wanted to catch the two others involved, they should look for a black Yukon that was probably headed to the Key West motel on Highway 29 (*id.* at 460).

Ms. Tisha Ruman testified at Petitioner's trial (Ex. B at 707–803). She testified she met Petitioner in Port Huron, Michigan, in 2010 (*id.* at 709–10). Ms. Ruman testified that in November of 2011, she, Petitioner, Harold Carter, and Devontae Baskin traveled to Pensacola, Florida, to engage in the production and passing of counterfeit checks (*id.* at 710, 715–16). Ms. Ruman testified that upon their arrival in Florida, Petitioner assisted her in obtaining an identification card to

enable her to cash counterfeit checks (*id.* at 711). Ms. Ruman testified she and Petitioner stayed in several motels, including the Palm Court and the Key West (*id.* at 712–15). Ms. Ruman testified she rented the room at the Key West motel on December 26, 2011, and stayed there until she was arrested on December 29, 2011 (*id.* at 713).

Ms. Ruman testified that she, Petitioner, Naomi Iftakar, Harold Carter, Javarius Slater, and Devontae Baskin were involved in counterfeiting checks and passing the counterfeit checks in Escambia County (Ex. B at 715, 717–26). Ms. Ruman testified that she and Petitioner produced the counterfeit checks (*id.* at 718–20). Ruman testified that she and Petitioner ordered blank check stock paper and used Petitioner's computer equipment (*id.*). Ruman testified that she and Petitioner would "cut and paste" information from real checks, scan it into the computer, and print counterfeit checks on check stock paper (*id.*). Ms. Ruman testified that Petitioner would "call the group together," and they would take turns driving Petitioner's black Yukon SUV (*id.* at 717–18, 721–22). Ruman testified that the person who was going to cash the counterfeit check (i.e., the payee of the check) would select the store in which to cash it (*id.* at 717–18). Ms. Ruman testified that most of the checks included a phone number for the purported business which issued the check (*id.* at 722–23). Ruman testified that she and Petitioner used several cell phones for the counterfeiting operation, and each phone was labelled

with a purported business name and phone number as it appeared on the counterfeit checks (*id.*).   Ruman testified that if the store in which the counterfeit check was being cashed called the phone number on the check, either she or Petitioner would answer the respective cell phone and verify the authenticity of the counterfeit check (*id.*).   Ms. Ruman admitted she prepared "cheat sheets" for the cashers of the checks, so they could answer questions which may be asked if a victim business attempted to verify the check (*id.* at 725–26).   Ms. Ruman testified that once the payee/casher cashed the check and received cash, the payee/casher would give the cash to Petitioner, and Petitioner would return half of the cash to the payee/casher (*id.* at 721–22).   Ms. Ruman testified that although she "did a lot of the paperwork" in the counterfeiting scheme, Petitioner was the person in control (*id.* at 726–27).

Ms. Ruman admitted that upon her arrest, she was not initially forthcoming with law enforcement about her involvement in the counterfeiting operation, but she later admitted her full involvement (Ex. B at 729).   Ms. Ruman testified that there was period of time when she was in jail, but Petitioner was not (*id.*).   She testified that Petitioner wrote her letters pressuring her to "take the charges" and deny his involvement (*id.* at 730–36).   Ruman testified Petitioner wanted her to write his attorney and say he was not involved, and to also testify on his behalf (*id.* at 731–32).   Ms. Ruman testified Petitioner drafted an affidavit for her to sign, but

she did not sign it because it included untruthful statements (*id.* at 730–31, 733). The letters and affidavit were admitted into evidence.

Harold Carter, whose nickname was "Sonnie," testified he met Petitioner in Michigan in April or May of 2011 (Ex. B at 804–07, 816). Carter testified that an acquaintance told him that he knew someone who was looking for people to cash counterfeit checks, and introduced Carter to Petitioner (*id.* at 807). Mr. Carter testified he met Tisha, Naomi, Javarius Slater, and a man named "Tae" (Devontae Baskin) all of whom were involved in passing counterfeit checks (*id.* at 807–09). Carter testified that Petitioner was "running the show" (*id.* at 809–10, 831). Carter described the scheme as follows:

> [W]e all use [sic] to get our checks from Kevin [Petitioner] and we go cash them. He take [sic] us around to cash them and he get half the money, and we keep half.

(Ex. B at 810). Mr. Carter provided details about the scheme which were generally consistent with the details provided by Ms. Ruman and Ms. Iftakar (*id.* at 810–22). Mr. Carter testified that while he was in jail, he received letters from Petitioner (*id.* at 822–24). Carter testified Petitioner asked him to "tell what happened," but in an untruthful way (*id.*). Carter testified that in one of the letters, Petitioner asked him to blame Naomi and Tisha for the counterfeiting operation (*id.* at 824). Carter testified Petitioner also asked him to tell his (Carter's) lawyer to tell Petitioner's lawyer that Petitioner had nothing to do with the scheme (*id.* at 834). Mr. Carter

testified Petitioner also prepared an affidavit for him to sign, blaming Naomi and Tisha (*id.* at 833–34). Carter testified he signed the affidavit even though it was untruthful (*id.*). The letters and affidavit were admitted into evidence.

Javarius Slater testified he met Petitioner through "Sonnie" (Harold Carter) in December of 2011 (Ex. B at 866–67). Slater testified Petitioner described how the counterfeit check scheme worked, and Slater joined the operation (*id.* at 867–69). Mr. Slater provided details about the scheme which were generally consistent with the details provided by Ms. Ruman, Ms. Iftakar, and Mr. Carter (*id.* at 869–81). Mr. Slater testified he always gave Petitioner the cash he received, so he assumed Petitioner was in charge of the counterfeiting scheme (*id.* at 879–80).

The prosecution also presented evidence regarding the black Yukon SUV. As previously discussed, when Naomi Iftakar was arrested, she told police that the people who were involved with her in the counterfeiting scheme were driving a black Yukon and were probably headed to the Key West motel on Highway 29 (Ex. B at 460). Sandra Webber, an investigator with the Escambia County Sheriff's Office ("ECSO"), testified she responded to the Key West Inn on Highway 29 to locate a black Yukon SUV (*id.* at 351–54). Webber testified she saw a thin black male over six feet tall taking computer equipment out of a motel room and placing it in the Yukon (*id.* at 358–60). Webber testified other officers arrived at the scene, and as they attempted to locate the black male, Webber saw a

female nearby (*id.* at 362, 365–66).  Investigator Webber stopped the female, and the female identified herself as Tisha Ruman and stated she was staying in the motel room from which Webber saw the black male take computer equipment (*id.* at 362–63, 366).

Investigator Brewster arrived at the motel room and determined that it was registered to Tisha Ruman (Ex. B at 373–75).  Ms. Ruman was placed in custody and advised of her rights (*id.* at 375).    Ms. Ruman agreed to speak with Investigator Brewster and consented to a search of the motel room (*id.* at 375–76, 694–95).  The following items were discovered in the motel room:  (1) two cologne bottles with Petitioner's fingerprints on them, (2) a laptop, (3) four cell phones, each labeled with a phone number and descriptions such as "Ford," "Chrysler Pension and Payroll," and "child support," (4) blank checks and check paper, (5) Tisha Ruman's identification card, (5) papers connected to Harold Carter and Javarius Slater, and (6) papers with Petitioner's name on them (including an envelope, a Western Union money transfer slip, and a traffic ticket) (*id.* at 383, 387–97, 413–17, 634–44).

Investigator Harry Kilpatrick testified he arrived at the Key West motel and contacted Investigator Brewster and other officers (Ex. B at 694).    Kilpatrick testified he observed a black Yukon SUV backed into the area around Room 214 (*id.* at 695–96).  Kilpatrick testified that the back hatch of the Yukon was up, and

the door to Room 214 was open (*id.*).  Investigator Kilpatrick testified the Yukon was impounded by the ECSO on December 30, 2014, and then searched (*id.* at 696).  Kilpatrick testified that officers seized a scanner, computer hard drives, a printer, electrical cords, and paperwork from the Yukon (*id.* at 633, 696–700).

Considering the trial evidence in the light most favorable to the prosecution, it was reasonable for the First DCA to conclude that any rational trier of fact could have found the essential elements of a RICO conspiracy beyond a reasonable doubt.  Petitioner failed to demonstrate that the state court's adjudication of his federal due process claim was contrary to or an unreasonable application of <u>Jackson</u>.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

   B.   <u>Ground Two:  "Trial court erred denying Petitioner to [sic] end pro se [sic] and to be appointed full counsel during trial."</u>

Petitioner alleges on August 18, 2014, the trial judge spoke to Assistant Public Defender Zimmerman by telephone, and they agreed that APD Zimmerman would "be on call" and "ready to step in if needed" to assist Petitioner with "logistic issues" (ECF No. 24 at 12–14).  Petitioner alleges on the third day of trial, August 21, 2014, he provided a note to the trial judge requesting "to end pro se and be appointed full counsel" (*id.* at 12–13).  The note is part of the state court record (Ex. A at 413).  It reads:

> Your Honor,
>
> Sir, today was the day and I must conceed [sic] that I cannot do this.  I need an attorney and I will accept if you set me off to next year.  <u>I cannot continue.  I cannot go on!</u>

(*id.*) (emphasis in original).  Petitioner alleges the judge refused to appoint counsel (ECF No. 24 at 12–14).  Petitioner alleges the judge should have granted his request because "there were never any willy-nilly [sic] by Petitioner nor deliberate manipulation" (*id.* at 12, 14).  Petitioner further alleges there would have been no delay in trial or prejudice to the State by granting his request for representation by counsel, because APD Zimmerman was prepared to "step in," and Petitioner would have waived the conflict with the Public Defender's Office (*id.*).[8]  Petitioner alleges the court appointed at least sixteen (16) attorneys to represent him throughout the proceedings, but all of them were ineffective, and Petitioner had no choice but to attempt to represent himself (*id.* at 14).  Petitioner alleges he asked to end his pro se representation during trial, because he "was off his meds and having some mental health issues" (*id.*).  Petitioner contends his right to counsel

---

[8] The state court record refutes Petitioner's characterization of the court's telephone call with APD Zimmerman on August 18, 2014 (*see* Ex. B at 21–42).  At a pre-trial hearing on July 30, 2014, Petitioner exercised his right to represent himself (Ex. A at 217–59).  The trial court secured the agreement of APD Zimmerman to assist Petitioner only with discovery (*id.* at 217–20).  On August 18, 2018, the day of jury selection, Petitioner complained that he had not received all of the discovery (Ex. B at 5–20).  The trial court contacted APD Zimmerman by telephone, and Zimmerman participated in an on-the-record discussion (*id.* at 21–26).  At the conclusion of the discussion regarding discovery, the court stated, "Mr. Zimmerman, if we need you again, we'll call you back." (*id.* at 42).  The court did not appoint APD Zimmerman as

reattached when he requested appointment of counsel, and the trial court violated his right to counsel guaranteed by the Constitution and by Rule 3.111(d)(5) of the Florida Rules of Criminal Procedure (*id.* at 13–14).

Petitioner asserts he presented this issue to the state courts in the Rule 3.850 proceeding, but the courts denied the claim as procedurally barred (ECF No. 24 at 12, 15). Petitioner alleges he did not present the claim on direct appeal, because his appellate counsel "refused" (*id.* at 12).

Respondent asserts an exhaustion/procedural bar defense (ECF No. 37 at 24–28). Respondent argues Petitioner did not present this claim on direct appeal, and he may not rely upon ineffective assistance of appellate counsel ("IAAC") to excuse the procedural default, because Petitioner did not present an IAAC claim to the state courts (*id.* at 24–25).[9] Respondent further contends that although Petitioner presented Ground Two in the Rule 3.850 proceeding, the state courts determined that the claim was procedurally barred, because it could have and should have been raised on direct appeal (*id.* at 25–27). Respondent contends Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to overcome the bar arising from the procedural default of Ground Two;

---

standby counsel; and APD Zimmerman did not express he was prepared to represent Petitioner at trial.

[9] Respondent notes that Petitioner asserted Ground Two in a pro se supplemental brief in the direct appeal, but the First DCA struck the supplemental brief (*see* ECF No. 37 at 25 n.2).

therefore, the claim should be denied as unexhausted and procedurally barred (*id.* at 25–28).

In Petitioner's reply, he acknowledges that Ground Two is "unrelated" to the claim presented by his appellate counsel on direct appeal regarding standby counsel (ECF No. 41 at 15). Petitioner alleges his appellate counsel never informed him of the method for presenting IAAC claims to the Florida courts, and Petitioner was not otherwise aware of it (*id.* at 15, 17–18). Petitioner alleges he attempted to present Ground Two in his pro se supplemental brief on direct appeal, but the First DCA struck the pleading (*id.*). Petitioner argues the cause of the procedural default of Ground Two was IAAC (*id.* at 17). He additionally alleges the Public Defender's Office and The Florida Bar prevented him from presenting Ground Two to the state courts, because he sent them letters concerning his appellate counsel's ineffectiveness, but neither office provided him assistance (ECF No. 45).

Petitioner also contends this federal court's failure to consider the merits of Ground Two would result in a fundamental miscarriage of justice, because the trial court's failure to appoint counsel was a "flagrant" and "egregious" violation of his constitutional right to counsel (ECF No. 41 at 17–18). Petitioner alleges if he had been represented by counsel at trial, counsel would have proved Petitioner's actual innocence, because counsel would have "objected to testimony outside scope and

proved he [Petitioner] was not associated with R.I.C.O. enterprise in Florida" (*id.* at 18).

The parties do not dispute, and the state court records confirms, that Ground Two was not properly presented to the state courts on direct appeal of Petitioner's conviction.[10]   Additionally, there is no dispute that Petitioner presented Ground Two as "Ground #2" of his third amended Rule 3.850 motion (Ex. J at 48–50). The state court denied the Rule 3.850 motion on state procedural grounds, i.e., that all of the claims presented by Petitioner were procedurally barred because they were claims of judicial error which could have and should have been raised on direct appeal (*id.* at 74–77).   The First DCA affirmed the circuit court's disposition, without written opinion (Ex. K).

The state courts' procedural ruling qualifies as an independent and adequate state rule of decision under the three-part test set forth in <u>Judd</u>, 250 F.3d at 1313. Therefore, the state court's application of the state procedural bar will be honored by this federal court.

---

[10] As Respondent argues, and as Petitioner concedes, the issue presented by Petitioner's appellate counsel was that the trial court erred by failing to appoint <u>standby</u> counsel for Petitioner (Ex. C at 18–32) (emphasis added).   Counsel conceded that the appointment of standby counsel was not constitutionally required, but was "constitutionally permissible" (*id.* at 18–19).   Appellate counsel did not argue that the trial court erred by refusing to appoint "full" counsel (*see id.*).   Petitioner attempted to "supplement" counsel's argument by filing a "Pro-Se Supplemental Brief of Appellant Preliminary Statement," in which he argued as Issue One, that the trial court violated his Sixth Amendment right to "full counsel" (Ex. D at 5–6).   The First DCA struck the pro se "supplemental brief" as unauthorized (Ex. E).

As discussed *supra*, to overcome a procedural default such that this court may consider the merits of his claims, Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. Petitioner argues the procedural default was caused by IAAC.

Although ineffective assistance of counsel which rises to the level of a constitutional deprivation can serve as cause for purposes of a procedural default analysis, the issue of ineffective assistance must first be presented as an independent state claim and exhausted in the state courts. Murray, 477 U.S. at 488; Orazio v. Dugger, 876 F.2d 1508 (11th Cir. 1989). In Florida, a claim of IAAC is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken. *See* Fla. R. App. P. 9.141(d); Davis v. State, 875 So. 2d 359, 372 (Fla. 2003). Here, Petitioner did not present a claim of IAAC to the First DCA, and the limitations period set forth in Rule 9.141(d)(5) has expired.[11] Petitioner's ignorance of Rule 9.141(d) does not excuse his failure to

---

[11] Petitioner does not allege counsel affirmatively misled him about the results of the direct appeal; therefore, he had two years after the judgment and sentence became final on direct review to file a petition alleging IAAC under Rule 9.141(d). *See* Fla. R. App. P. 9.141(d)(5). Petitioner's judgment and sentence became final on February 2, 2016, when the First DCA issued the mandate in the direct appeal. *See* Mendoza v. State, 224 So. 3d 836, 837 (Fla. 3d DCA 2017). Therefore, Petitioner had until February 2, 2018 to file a Rule 9.141(d) petition. He did not do so.

avail himself of that remedy.  *See* Tower, 7 F.3d at 211 (ignorance of available post-conviction remedies cannot excuse a procedural default) (citations omitted).

Further, Petitioner's blaming the Public Defender's Office and The Florida Bar for his failure to present Ground Two is unavailing.  Petitioner characterizes these agencies as "external impediments" to his exhausting Ground Two, because they "rejected" letters he wrote "concerning this critical claim" (ECF No. 45).  For cause to exist, the external impediment, whether it be government interference or the reasonable unavailability of the factual basis for the claim, must have prevented the petitioner from raising the claim.  *See* Murray, 477 U.S. at 488 (emphasis added).  Petitioner's allegation that the agencies "rejected" his letters falls far short of demonstrating that either agency prevented him from presenting Ground Two or an IAAC claim to the state courts. [12]  Petitioner has failed to satisfy the "cause and prejudice" exception to the procedural bar. [13]

---

[12] Petitioner's lack of counsel in the Rule 3.850 proceeding cannot serve as cause for the procedural default of Ground Two, since the procedural default occurred on direct appeal.

[13] To the extent Petitioner is arguing that the trial court's refusal of his post-waiver request for counsel was structural error, the nature of the error does not render it immune from application of a procedural bar on federal habeas.  *See* Engle v. Isaac, 456 U.S. 107, 129, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982) ("While the nature of a constitutional claim may affect the calculation of cause and actual prejudice, it does not alter the need to make that threshold showing. . . .  [A]ny prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief."); Hollis v. Davis, 941 F.2d 1471, 1476–83 (11th Cir. 1991) (applying, in a § 2254 proceeding, the "cause and prejudice" test to claims based on structural errors under Vasquez v. Hillery, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986)).

Petitioner has also failed to demonstrate he is entitled to federal review of Ground Two through the fundamental miscarriage of justice exception.  Petitioner contends this federal court's failure to consider the merits of Ground Two would result in a fundamental miscarriage of justice, because the trial court's failure to appoint counsel was a "flagrant" and "egregious" violation of his constitutional right to counsel (ECF No. 41 at 17–18).  Petitioner has not supported his allegation of constitutional error (i.e., that the trial court erred by refusing Petitioner's post-waiver request for counsel) with new reliable evidence (e.g., exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence) which supports a colorable showing of his factual innocence of the RICO conspiracy charge.  Therefore, he has not demonstrated he is entitled to federal review of Ground Two through the fundamental miscarriage of justice exception.

Ground Two is procedurally barred, and Petitioner has failed to demonstrate he is entitled to review of the claim through any recognized exception to the procedural bar.  Therefore, Petitioner is not entitled to habeas relief on Ground Two.

C.    Ground Three:  "The State's Information is legally insufficient.  It doesn't plead open-ended or valid closed-ended continuity."

Petitioner alleges the charging document failed to properly plead continuity of an enterprise, which is an essential element of the crime (ECF No. 24 at 15).

Petitioner alleges the Information did not allege that the group was engaged in similar activity in the past or engaged in other criminal activity (*id.*). Petitioner concedes he did not present this claim to the state courts (*id.* at 16). He concedes his appellate counsel did not present the issue on direct appeal (*id.*). Petitioner also concedes he did not present it in the Rule 3.850 proceeding, because he is a "layman at law" and did not know that the claim could be presented in a Rule 3.850 motion (*id.* at 16–17, 24).

Respondent asserts an exhaustion/procedural bar defense (ECF No. 37 at 28–29). Respondent contends Ground Three was not presented on direct appeal, and Petitioner may not rely upon IAAC to excuse the procedural default, because Petitioner has not presented an IAAC claim to the state courts (*id.*). Respondent asserts that in the body of Petitioner's argument in Ground Four of his third amended Rule 3.850 motion, Petitioner argued that the Information failed to properly plead continuity of an enterprise, which is the argument Petitioner presents here in Ground Three (*id.* at 29). Respondent asserts the state court determined that the claim was procedurally barred, because it could have and should have been raised on direct appeal (*id.* at 29). Respondent contends Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice to overcome the bar arising from the procedural default of Ground Three; therefore, the claim should be denied as unexhausted and procedurally barred (*id.*).

In Petitioner's reply, he argues the merits of Ground Three (*see* ECF No. 41 at 19).

The state court record confirms that Petitioner did not present a challenge to the sufficiency of the charging document on direct appeal (*see* Ex. C). In the Rule 3.850 proceeding, Petitioner claimed, in Ground Four, that the trial court erred in denying his motion for judgment of acquittal ("JOA"), because the State failed to prove the existence of an enterprise (*see* Ex. J at 54–66). Within Petitioner's 24-paragraph argument of that claim, Petitioner included two references to the sufficiency of the charging document. Paragraph 1 stated,

> The State's information in defendant's case does not properly plead continuity of an enterprise. The law says they must allege that the group had engaged in similar endeavors in the past or engaged in other criminal activity. Defendant's information doesn't. *See U.S. v. Elliot*, 571 F.2d 880 which clearly plead [sic] continuity. *HJ. Inc. v. Bell*, 109 S. Ct. 2893.
> :

(Ex. J at 54). The first sentence of paragraph 22 stated, "The state failed to properly plead a pattern of racketeering activity or prove a pattern of racketeering activity." (*id.* at 62). The remainder of Petitioner's argument focused on the State's failure to <u>prove</u> (as opposed to plead) the existence of an enterprise (*id.* at 54–66).

Assuming, for argument's sake, that these references in Petitioner's Rule 3.850 motion satisfied the "fair presentation" requirement, the state courts'

rejection of Ground Four on state procedural grounds (i.e., the claim could have and should have been presented on direct appeal (*see* Ex. J at 74–77)) qualifies as an independent and adequate state rule of decision, to which this federal court must defer. Therefore, Ground Three is procedurally barred from federal review.

Petitioner has not shown cause and prejudice to overcome the procedural default. As discussed *supra*, Petitioner did not exhaust any IAAC claims in state court; therefore, his argument that his appellate counsel failed to present the claim on direct appeal does not constitute cause for the procedural default. Further, Petitioner's lack of counsel in the Rule 3.850 proceeding cannot serve as cause, because the procedural default occurred on direct appeal. Additionally, Petitioner has not satisfied the fundamental miscarriage of justice exception to the procedural bar. Therefore, Petitioner is not entitled to habeas relief on Ground Three.

D.   Ground Four:  "Trial court violated Rule 3.210(b) where it failed to order and hold a competency hearing."

Petitioner alleges the trial court ordered a psychological evaluation but never held a competency hearing or obtained Petitioner's valid waiver of a hearing, as required by Rule 3.210 of the Florida Rules of Criminal Procedure (ECF No. 24 at 17–19). Petitioner contends the trial court also failed to appoint two experts to examine him (*id.* at 18). Petitioner additionally argues the trial court should have revisited the competency issue when Petitioner requested to end his pro se

representation during trial, because his circumstances had changed, i.e., he had not taken his medication (*id.* at 18–19). Petitioner contends the trial court violated his constitutional right to due process and a fair trial by failing to hold a competency hearing and by trying him while he was mentally incompetent (ECF No. 24 at 18–19; ECF No. 41 at 20–22). Petitioner asserts he presented this claim to the state courts on direct appeal and in his Rule 3.850 motion (ECF No. 24 at 17; ECF No. 41 at 22).

Respondent asserts an exhaustion/procedural bar defense to Ground Four (ECF No. 37 at 30–32). Respondent argues Petitioner did not fairly present a federal claim regarding the competency issue on direct appeal, because Petitioner's appellate counsel argued only that the trial court's failure to hold a competency hearing violated Florida case law and procedural rules (*id.* at 31). Respondent further argues that in Ground #3 of Petitioner's third amended Rule 3.850 motion, Petitioner presented a procedural incompetency claim, citing both Florida case law and Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), but the state court denied the claim as procedurally barred because it was or should have been presented on direct appeal (*id.* at 31–32). Respondent contends this was an independent and adequate state court which bars the federal court's consideration of Ground Four (*id.*).

Initially, to the extent Petitioner asserts a substantive incompetency claim in Ground Four, the claim is unexhausted and procedurally barred.  On direct appeal and in the Rule 3.850 proceeding, Petitioner presented only procedural incompetency claims (*see* Ex. C at 32–24, Ex. J at 51–53).  Additionally, any attempt to return to state court to attempt to exhaust a substantive incompetency claim would be futile.  "In Florida, a substantive incompetency claim can be raised on direct appeal only and is procedurally barred from being raised in a postconviction motion." Thompson v. State, 88 So. 3d 312, 317 (Fla. 4th DCA 2012) (citing Carroll v. State, 815 So.2d 601, 610 (Fla. 2002); Patton v. State, 784 So.2d 380, 393 (Fla. 2000); Johnston v. State, 583 So.2d 657, 660 (Fla. 1991)).

Petitioner has not shown cause for his failure to present a substantive incompetency claim on direct appeal.[14]  Further, Petitioner has not proffered any new evidence of his actual innocence of the RICO conspiracy count.  Therefore, he has not shown that this court's failure to consider the substantive incompetency claim will result in a fundamental miscarriage of justice.

The landscape is different with respect to Petitioner's procedural claim regarding competency, which the court will refer to as a procedural Pate claim. Petitioner appears to assert two bases for the procedural Pate claim:  (1) the trial

---

[14] Petitioner did not exhaust any IAAC claims in the state courts; therefore, IAAC cannot serve as cause for the procedural default.

court erred by failing to hold a competency hearing prior to trial, and (2) the trial court erred by failing to hold a competency hearing during trial, on August 21, 2014, when Petitioner gave the trial judge a note requesting to end his pro se representation.

With respect to Petitioner's pre-trial procedural <u>Pate</u> claim, Respondent contends Petitioner failed to fairly present a federal claim on direct appeal, and instead argued the issue on only state law grounds. In Petitioner's initial brief, appellate counsel argued a procedural competency claim as Issue Two (Ex. C at 32–34). Appellate counsel asserted that the prosecutor raised the competency question by filing a motion to determine if Petitioner was competent to proceed, and the trial court ordered a competency evaluation based upon the prosecutor's motion (*id.*). Appellate counsel asserted the appointed mental health expert opined that Petitioner was competent (*id.*). Appellate counsel argued the trial court issued an order finding that Petitioner was competent to proceed, without holding a hearing (*id.*). Appellate counsel cited Rule 3.210(b) of the Florida Rules of Criminal Procedure, but counsel also cited two Florida cases which decided the procedural incompetency issue on federal grounds, <u>Carrion v. State</u>, 859 So. 2d 563 (2003) and <u>Mairena v. State</u>, 6 So. 3d 80 (Fla. 5th DCA 2009) (*see id.*). Both of those cases relied upon the Supreme Court's decision in <u>Pate</u>. Appellate counsel's citation to those cases was sufficient to alert the First DCA to the federal

nature of Petitioner's claim.  *See* <u>Baldwin</u>, 541 U.S. at 32.  Therefore, the court will determine whether Petitioner has satisfied § 2254(d) with respect to his procedural <u>Pate</u> claim.

But first the court will address Petitioner's second procedural <u>Pate</u> claim, i.e., that the trial court erred by failing to conduct a competency hearing during the middle of trial, when Petitioner gave the judge the note requesting appointment of counsel.[15]  Petitioner did not present this claim to the state court on direct appeal (*see* Ex. C), but he did present it as Ground #2 of his third amended Rule 3.850 motion (Ex. J at 48–50).  The state court rejected the claim on state procedural grounds, i.e., the claim could have and should have been presented on direct appeal (*see id.* at 74–77).  This state procedural rule is firmly established and regularly followed.  *See* <u>Thompson</u>, 88 So. 3d 312, 316 (citing <u>Nelson v. State</u>, 43 So. 3d 20, 33 (Fla. 2010), <u>James v. Singletary</u>, 957 F.2d 1562, 1572 (11th Cir. 1992), and <u>Bundy v. State</u>, 538 So.2d 445, 447 (Fla.1989)).  Petitioner has not satisfied either the cause and prejudice exception or the fundamental miscarriage of justice

---

[15] As noted *supra* in Ground Two, the note stated:

Your Honor,

    Sir, today was the day and I must conceed [sic] that I cannot do this.  I need an attorney and I will accept if you set me off to next year.  <u>I cannot continue.  I cannot go on!</u>

(Ex. A at 413) (emphasis in original).

exception to the procedural bar.[16]  Therefore, he is not entitled to federal review of the procedural <u>Pate</u> claim based upon the trial court's failure to hold a competency hearing upon Petitioner's requesting appointment of counsel during trial on August 21, 2014.

This leaves only the procedural <u>Pate</u> claim based upon the trial court's alleged failure to hold a pre-trial competency hearing, which is the only part of Ground Four that is not procedurally barred.

### 1.   Clearly Established Federal Law

The Due Process Clause of the Fourteenth Amendment prohibits the State from trying or convicting a defendant who is mentally incompetent.  *See* <u>Pate</u>, 383 U.S. at 378.  The Supreme Court set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." <u>Dusky v. United States</u>, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed 2d 824 (1960) (per curiam); <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975); *see also* <u>Indiana v. Edwards</u>, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008).  Florida courts follow this standard.  *See* <u>Hernandez–Alberto v. State</u>,

---

[16] Because the procedural default occurred on direct appeal, Petitioner's lack of counsel in the Rule 3.850 proceeding did not cause the procedural default.  Further, as previously

126 So. 3d 193, 209 (Fla. 2013) (citing <u>Dusky</u>, 362 U.S. at 402; <u>Drope</u>, 420 U.S. at 171).

<u>Pate</u> established a rebuttable presumption of incompetency upon a showing by a habeas petitioner that the state trial court failed to hold a competency hearing despite information raising a bona fide doubt as to the petitioner's competency." <u>James v. Singletary</u>, 957 F.2d 1562, 1571 (11th Cir. 1992). To trigger the rebuttal presumption, however, "the petitioner bears the burden of showing that objective facts known to the trial court were sufficient to raise a bona fide doubt" as to the petitioner's competency. <u>Medina v. Singletary</u>, 59 F.3d 1095, 1106 (11th Cir. 1995). Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." <u>Drope v. Missouri</u>, 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). A <u>Pate</u> claim is necessarily confined to information before the trial court before and during trial. *See* <u>Medina</u>, at 1106 ("A <u>Pate</u> claim 'can and must be raised on direct appeal' because an appellate court hearing the claim 'may consider only the information before the trial court before and during trial.'" (quoting <u>James</u>, 957 F.2d at 1572)).

---

discussed, Petitioner did not exhaust an IAAC claim in the state courts; therefore, IAAC cannot serve as cause for the procedural default.

The standard of competency for standing trial is the same as the competency standard for waiving the right to counsel.  *See* <u>Godinez v. Moran</u>, 509 U.S. 389, 397, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993).

2.    Federal Review of State Court Decision

The state court record shows that March 28, 2014, five months prior to Petitioner's trial, the prosecutor filed a "Motion to Appoint Expert to Evaluate Defendant's Competency to Proceed and Defendant's Ability to Represent Himself Pro Se" (Ex. A at 85–88).  The prosecutor set forth the following grounds for the motion:

> 1. The undersigned Assistant State Attorney was just assigned to prosecute this defendant several weeks ago.

> 2. The undersigned prosecutor has reviewed the court docket and the state attorney's office files for this defendant.

> 3. In particular, the undersigned has reviewed the defendant's handwritten motions and the letters he addressed to the Honorable Circuit Judge Ross Goodman and to the Honorable Circuit Judge Terry Terrell.

> 4. The undersigned has observed defendant's aberrant courtroom behavior in which he has exhibited pressured speech, unwarranted hostility toward defendant's most recently appointed counsel, Spiro Kypreos, who defendant wanted removed as his attorney shortly after Mr. Kypreos was appointed, and unwarranted hostility toward Judge Goodman.

> 5. The state's file reflects that the defendant has purportedly written a letter to his previous counsel, Cheryl Gooden, in which he threatened to kill the previous prosecutor assigned to this case, Trey

Myers.  A motion to compel Ms. Gooden to turn over the defendant's letter or letters containing the threat is still pending.

6. On March 18, 2014, at the <u>Faretta</u> hearing before Judge Goodman, the judge asked the defendant whether defendant had any mental issues.  When he responded, the defendant appeared to hedge at first before admitting to some depression issues for which he acknowledged receiving medication for [sic] at the jail.

7. In reviewing the defendant's correspondence dated 2-16-14 to Judge Terrell (who apparently had sat in for Judge Goodman at a different hearing), the defendant stated in his letter:  **"Sir, I am mentally disabled, I suffer with phycossis (sic) and visions. Because of this, and Attorney Gooden was fully aware as she had stated, Clinton Couch [a defense attorney] from the start. Wanted to do a phyc (sic) eval (sic) on me, I told her my condition"**. (Copy of letter attached as Exhibit 1)

8. At the top of the third page of the defendant's letter to Judge Terrell, the defendant states:

**"They try to take advantage of me cause of my mental disability"**

9. In addition to the determination of the defendant's competency to stand trial, the state requests that this court conduct another <u>Faretta</u> hearing to inquire deeper into the defendant's mental issues to determine whether the defendant is really competent to represent himself in this matter.

(Ex. A at 85–87).

Petitioner, who was proceeding pro se at the time the State filed the motion, filed a response in opposition to the State's motion (Ex. A at 138).  Petitioner explained that he only mentioned his issues with depression because he was attempting to point out that his court-appointed attorneys "felt they could railroad

defendant because he had depression issues" (*id.*).   Petitioner continued, "It is beyond obvious that defendant is competent . . . ." (*id.*).   Petitioner asserted the prosecutor filed the motion to appoint a competency expert because the prosecutor wished to force appointed counsel upon Petitioner in order to control him and to avoid having to respond to Petitioner's voluminous pro se filings (*id.*).

The docket reflects that on April 17, 2014, the trial court held a hearing on several motions, including the prosecutor's motion to appoint an expert to evaluate Petitioner's competency and his ability to represent himself (Ex. A, Progress Docket Report, Page ##12–13).  The trial court denied the prosecutor's motion (*see id.*).  Additionally, the court inquired of Petitioner whether he wished to continue to represent himself or whether he wished to request appointment of counsel (*see id.*).  Petitioner requested appointment of counsel (*see id.*).  The court appointed Attorney P. Hamlin to represent Petitioner (*see id.*).

At a hearing two months later, on June 2, 2014, the court allowed Attorney Hamlin to withdraw due to a conflict of interest (Ex. A at 212–15).  Petitioner announced he wished to waive his right to counsel and proceed pro se (*id.* at 216).  Petitioner was placed under oath (*id.* at 223), and the court conducted an extremely thorough <u>Faretta</u> inquiry, including questioning Petitioner about the statements he made in his correspondence to Judge Terrell regarding his mental health (*id.* at 216–59, 291).  Petitioner denied he was mentally disabled or that he suffered from

psychosis, and stated that the only condition with which he had ever been diagnosed or treated was depression (*id.* at 237–50). Petitioner attempted to explain his statements in his letters to Judge Terrell by stating he should have more fully explained that when his mother passed away in 2005 or 2006 (eight years prior to the hearing), he was very depressed and heard his mother's voice (*id.* at 255–59). Petitioner stated that he currently suffered from depression, but his condition was treated with Seroquel (*id.*). The court asked Petitioner if he was certain he did not desire appointment of counsel, and Petitioner responded, "No, sir" (*id.* at 291).

The court concluded the <u>Faretta</u> portion of the hearing as follows:

> THE COURT: Because I told you that I would, I'm going to hear your motions today. For now I'm going to let you represent yourself. I'm going to hear your [pro se] motions today, but I'm also going to order a psychological evaluation.

> THE DEFENDANT: Sir–

> THE COURT: I don't know that you're capable of representing yourself and I want a psychologist to give me an opinion whether you are. If he or she tells me you are, then we're good.

> THE DEFENDANT: Okay.

> THE COURT: If they tell me you're not–

> THE DEFENDANT: We can–can we proceed on as we wait for that?

> THE COURT: You bet.

. . . .

    MR. DUBOSE [the prosecutor]:  Given the fact that you're ordering a competency eval.  And you're going to hear his motions, it might be contrary to–

. . . .

    THE COURT:  It may be for not [sic].  I don't think it's going to do any harm.

. . . .

    I will say this:  If I deny any motions today and, if, for whatever reason I have to appoint counsel for, that [sic] if it becomes appropriate to appoint counsel later, it will be without prejudice to counsel filing new motions if they are appropriate.

(Ex. A at 259–60).  The court did not appoint standby counsel; however; the court granted Petitioner's request for assistance from the Public Defender's Office to only assist with discovery (*id.* at 217–20, 289–90, 296).  The court issued an order appointing Dr. Scott Benson, pursuant to Florida Statutes § 916.12, to evaluate Petitioner to determine whether he was competent to stand trial (*id.* 199–201).

Dr. Benson evaluated Petitioner on June 24, 2014 (*see* Ex. A at 308–12).  A copy of his report is part of the state court record (*id.*).  In the Mental Status Examination section of his report, Dr. Benson stated:

    The defendant did provide additional personal history.  He acknowledged previous treatment for psychiatric issues that occurred after his mother's death in 2006.  He was not willing to discuss details of that loss.

. . . .

    The defendant recalled seeing Dr. Mobley in the infirmary.  He is taking quetiapine 300 mg for his problems with depression.  He has not experienced racing thoughts, expansive mood, unusual sadness or crying spells.  He does not have a history of obsessive preoccupation or repetitive behavior.  He denied any hallucinations except for

unspecified hallucinations that had occurred in the distant past and were related to the death of his mother.

. . . .

The defendant was able to report his charges and recent court proceedings. The information he provided is consistent with available records. He did provide a hand-written "Affidavit Statement of Facts" dated 06/08/2014. That document is attached to this report. In this document he reiterated details of his case, his appreciation of the role of State's attorney, public offender, and the judge in regard to the case.

The defendant was in a pleasant mood. There was no indication of unusual anxiety, sadness or anger. There is no evidence of delusional thinking or hallucinations. He does not have feelings of hopelessness or suicidal ideation. He does not have a history of self-injurious behavior. He does not have a plan for harm to himself or others.

(Ex. A at 310). Dr. Benson diagnosed Petitioner as having a history of depression (*id.*).

Regarding Petitioner's competency to proceed, Dr. Benson stated, "It is my opinion with reasonable medical certainty that Kevin Lorenzo Joyner **IS** competent to stand trial." (Ex. A at 311 (emphasis in original)). Dr. Benson opined that Petitioner had an acceptable mental capacity to (1) appreciate the charges or allegations against him, (2) appreciate the range and nature of possible penalties, (3) understand the adversarial nature of the legal process, (4) clearly communicate pertinent facts surrounding the alleged offense, (5) relate to a others (even though he was at odds with his attorneys), (6) plan a defense, (7) realistically challenge prosecution witnesses, (8) manifest appropriate courtroom behavior, and (9) testify

relevantly (*id.* at 311–12).   Dr. Benson concluded that Petitioner had a "full understanding" of court proceedings (*id.* at 312).

With respect to the need for mental health treatment, Dr. Benson noted that Petitioner was currently in treatment with medication for his psychiatric symptoms (Ex. A at 312).   Dr. Benson did not recommend a change in Petitioner's current treatment (*id.*).   Dr. Benson did not recommend any training related to Petitioner's competency to proceed (*id.*).

Dr. Benson's report was filed with the court on July 7, 2014 (Ex. A at 308–12).

At a hearing on July 30, 2014, a copy of Dr. Benson's report was admitted into the record (*see* Ex. A at 372), and the court found Petitioner competent to proceed (*see* Ex. A Progress Docket Report, Page #16).   The court also conducted a <u>Faretta</u> hearing, during which Petitioner requested appointment of counsel (*see id.*).   The court granted Petitioner's request and appointed counsel (*see id.*).   The next day, on July 31, 2014, the court issued the following order on the competency issue:

> The State suggested to the Court that the Defendant in this case might not be competent to proceed, based upon some statements made by the Defendant in letters directed to the Chief Judge.   In response to that suggestion, the Court ordered an evaluation of this Defendant by Dr. Scott Benson.   Dr. Benson has filed a report with the Court finding that Mr. Joyner is competent to proceed.   Based on that

> evaluation, together with the Court's own observations of Mr. Joyner, the Court finds that Mr. Joyner is competent to proceed in this matter.

(Ex. A at 378).

As previously discussed, Petitioner's appellate counsel presented this procedural Pate claim on direct appeal (Ex. C at 32–34). The First DCA affirmed the judgment and sentence, thus determining that the trial court did not violate Petitioner's federal right to due process with respect to the procedural competency issue.

As discussed *supra*, where a state court denies relief without providing an explanation or its reasoning, as the First DCA did in affirming the judgment without written opinion, the habeas petitioner must show that there was no reasonable basis for the state court's decision. *See* Richter, 562 U.S. at 98. The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See id.*; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state

court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Here, the objective facts known to the trial court did not create a bonda fide doubt about Petitioner's competency to stand trial. The prosecutor's motion to appoint an expert to evaluate Petitioner's competency was based primarily on Petitioner's "unwarranted hostility" toward the lawyers and the trial court, and Petitioner's statements regarding his mental health in a letter to Judge Terrell. Petitioner immediately responded to the prosecutor's motion by explaining his statements to Judge Terrell, suggesting that the prosecutor's motive for filing the motion was to control Petitioner's filings, and insisting that he was competent to proceed.

Additionally, during the court's lengthy Faretta colloquy on June 2, 2014, Petitioner was coherent, articulate, and understood the criminal proceedings. The court deemed Petitioner competent to represent himself and granted Petitioner's request to do so. At the same time, the court appointed Dr. Benson to evaluate Petitioner's competency. Petitioner's appellate counsel argued that the assertions in the prosecutor's motion to appoint an expert raised a bona fide doubt as to Petitioner's competency, as evidenced by the fact that the court appointed Dr. Benson (see Ex. C at 33–34), but it is equally plausible that the court appointed Dr. Benson not because there was a bona fide doubt as to Petitioner's competency (as

evidenced by the fact that the court found Petitioner competent to represent himself), but because any suggestion of incompetence came from Petitioner's own subjective and contradictory statements (in his letter to Judge Terrell and his explanation of those statements during the June 2 hearing), whereas Dr. Benson could provide an objective, professional opinion regarding Petitioner's competency.

Further, the record on direct appeal indicated that the trial court <u>did</u> hold a hearing on the competency issue on July 30, 2014. According to the Progress Docket Report the following occurred July 30, 2014:

> STATE'S MOTION TO STRIKE FILED
>
> 12TH AMENDED DISCOVERY EXHIBIT FILED
>
> JUDGE NICKINSON
>
> DEFT IN CUSTODY (PRESENT IN COURT)
>
> HEARINGS HELD ON PRO SE PRE-TRIAL MOTIONS
>
> DEFENDANT FOUND COMPETENT TO PROCEED – COURT TO PREPARE WRITTEN ORDER
>
> FARETTA HEARING HELD–DEFENDANT REQUESTED COUNSEL, COURT APPOINTS CONFLICT COUNSEL MICHELLE HENDRIX
>
> MINI DOCKET DAY SET FOR 08/08/2014 AT 8:30 AM IN MC, JDG: NICKINSON, E P III
>
> EXHIBIT LIST FILED

CONFIDENTIAL PAPER/PICTURE EXHIBITS

HEARING WORKSHEET FILED

(Ex. A, Progress Docket Report, Page #16).  Additionally, the report of Dr. Benson bears an exhibit marker with the date "7-30-14" (Ex. A at 372).  The court's order finding Petitioner competent issued the day after the hearing (*id.* at 378).

The First DCA did not unreasonably apply clearly established federal law when it determined that the trial court afforded Petitioner all the process required to ensure that he was competent to stand trial.  *See* Watts v. Singletary, 87 F.3d 1282, 1290 (11th Cir. 1996); *see also, e.g.*, Carman v. Dep't of Corr., 598 F. App'x 706, 712–14 (11th Cir. 2015) (unpublished but recognized as persuasive authority).

In sum, parts of Ground Four are procedurally barred from federal review (i.e., Petitioner's procedural Pate claim based upon the trial court's failure to hold a competency hearing upon Petitioner's requesting appointment of counsel during trial on August 21, 2014, and Petitioner substantive incompetency claim (to the extent he asserts one)).  With respect to the remaining part of Ground Four (i.e., Petitioner's procedural Pate claim based upon the trial court's alleged failure to hold a competency hearing prior to trial), Petitioner has not satisfied § 2254(d).  Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

E.    Ground Five:  "The State failed to prove a pattern of racketeering activity.  The trial record contains no evidence of 'order' or 'arrangement' of predicate acts."

Petitioner alleges the "pattern of racketeering" element of the RICO conspiracy count requires more than the existence of predicate acts (ECF No. 24 at 21–22; ECF No. 41 at 23). He contends it requires evidence that there was order, arrangement, or continuity in the racketeering conduct, which the State failed to prove (*id.*). Petitioner contends the predicate racketeering acts alleged in the charging document constituted a single scheme or sporadic acts which spanned a period of only twenty-three days, and there was no evidence of a threat of long-term racketeering activity (*id.*). Petitioner states he asked counsel to present this issue on direct appeal, but counsel failed to do so (ECF No. 24 at 21). Petitioner concedes he did not present this issue in the Rule 3.850 proceeding, and explains he did not do so because he is "a layman at law" and did not understand the "pattern" concept at the time of the Rule 3.850 proceeding (*id.* at 21, 23).

Respondent contends to the extent Petitioner is presenting the claim presented in Issue Three on direct appeal (i.e., the evidence was insufficient to show an enterprise separate and apart from the racketeering activity), the issue was addressed *supra* in Ground One (ECF No. 37 at 33–34). Respondent contends to the extent Petitioner is presenting the argument he presented in Ground Four of his third amended Rule 3.850 motion, the claim is procedurally barred, because the state courts denied the claim pursuant to a firmly established and regularly

followed state procedural rule (i.e., that the claim could have and should have been raised on direct appeal) (*id.*).

In Ground Four of Petitioner's third amended Rule 3.850 motion, Petitioner argued that the trial court erred in denying the motion for JOA, because the State failed to prove the existence of an enterprise (*see* Ex. J at 54–66). Imbedded in that claim was an argument that the State failed to plead or prove a pattern of racketeering activity, because there was no evidence the predicate acts were committed in order or were arranged (*id.* at 62–63). The state circuit court denied the claim on the ground that it could have and should have been raised on direct appeal (*id.* at 74–77), and the First DCA affirmed (Ex. M). This state procedural rule is firmly established and regularly followed; therefore, this federal court will honor it.[17]

Petitioner has not shown cause and prejudice to overcome the procedural default. As discussed *supra*, Petitioner did not exhaust any IAAC claims in state court; therefore, his argument that his appellate counsel failed to present the claim on direct appeal does not constitute cause for his procedural default. Further, because the procedural default occurred on direct appeal, Petitioner's lack of counsel in the Rule 3.850 proceeding did not cause the procedural default.

---

[17] As Petitioner concedes, his appellate counsel did not present this argument on direct appeal (*see* Ex. C at 34–41).

Additionally, Petitioner has not satisfied the fundamental miscarriage of justice exception to the procedural bar. Therefore, Petitioner is not entitled to habeas relief on Ground Five.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" Buck v. Davis, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing Miller-El, 537 U.S. at 327). The petitioner here cannot make that showing. Therefore, the undersigned

recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie L. Jones as Respondent.

And it is respectfully **RECOMMENDED**:

1.     That the amended petition for writ of habeas corpus (ECF No. 24) be **DENIED**.

2.     That Petitioner's Motion for Evidentiary Hearing and Motion for Further Proceedings (ECF Nos. 42, 43) be **DENIED**.

3.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 5th day of April 2019.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**